Hear ye, hear ye, hear ye, this Honorable Appellate Court of the 2nd District is now open for suing to adjournment. The Honorable Susan Faye Hutchinson presiding. Please be seated. Your Honors, the first case of the morning called 211-0335, People of the State of Illinois v. Edward L. Tenney. On behalf of the Appellant, Mr. Kim Robert Fawcett. On behalf of the People, Ms. Diane L. Campbell. Good morning. Good morning, Your Honors. Kim Fawcett for Ed Tenney. May it please the Court, with the Court's permission, I would focus my argument this morning on issue number one in the briefs. That is the search and seizure issue involving the warrantless search of the storage lockers based on Ed Lippert's, Les Lippert's consent. The issue is whether Les Lippert had the apparent authority to authorize the detectives to open and search Ed Tenney's closed containers that were stored in that storage locker. Well, now we have an issue. You said Ed Tenney's closed container packages. Isn't there some dispute about whether they were closed or not? I actually, well, everyone agrees that the containers, which we're talking about are two cardboard boxes, and that there was a storage unit that was jammed full of these boxes. Everyone agrees that the boxes were not sealed by tape. There was tape on one box. Also, everyone agrees that the boxes were folded shut. That is, Captain Cannon and Detective Anderson both testified that they opened the flaps of the boxes. If you look at Cannon's testimony at the suppression hearing, they went in, they opened them. When the locker was open, they started dabbing boxes out. They opened the flaps and looked at them in order to see whose property was in there, and Les stood by to identify whose property. There's a very clear statement of that on page 3923, which I didn't see that page cited in any of the briefs, where Cannon says that, 3923. Detective Anderson says that at 4018, and Les and Ed both say that. But Anderson and Cannon are important ones. So I think they were closed, but not sealed. Counsel, you started out by talking about apparent authority. That apparent authority depends on, if we read Matlock and Illinois v. Rodriguez, two cases that you cited, depends on joint access and control that give rise to this common authority doctrine, correct? Yes. But there was never any joint control or access between Les Lippard and the defendant, Ed Tenney, for locker number 63, was there? Well, I say in the brief that there was a standing practice that he would store. My answer is yes, there was access. Joint access? There was access. And how was there joint access? Well, Les moved Ed's boxes from the farmhouse in Aurora to the Warrenville home and from Warrenville to the locker number 63. The understanding that he was keeping his son's and his nephew's boxes for them in storage units. So to my view, it doesn't matter which unit you're looking at. The agreement was that Les was keeping the other men's things for them, which was the standing practice. What in the record points to an agreement that he was keeping Ed Tenney's things for him in all of these different – I mean, there was more than locker 63. There were several that preceded it, correct? Well, there was locker number 19, which was too small, and they moved into there in late summer. Some of the items were moved from there to locker 500, but we're not concerned with those items because those don't concern the search in question. The boxes that we're talking about were the overage. They never made it into unit 19 or 500. They were diverted to the Warrenville home. Well, we don't know that. Yes, yes. How do we know that? Well, Les testifies to that very clearly in his testimony that he says those boxes in unit 63, I moved them into unit 63 from the Warrenville home. They had gone to the garage in Warrenville. I think that's Les's ex-wife. And then they got to the basement in Warrenville, and then they were ultimately moved from Warrenville after April of 1994. But Ed Tenney didn't move them, did he? At that point, he was incarcerated. That's right. And he was not on the written agreement for locker 63, was he? No, I don't think he was. None of the boys were on it. He didn't have keys to that locker 63, did he? No, no. And he never went in locker 63, did he? No. Counsel, couldn't you argue that Mr. Tenney had abandoned that property? He hadn't been with it for a long time, relinquishing control to Les Lippard? Well, I don't think he abandoned it, and I think he had a privacy interest in the control of the container. So if I may answer both questions at once, I think it doesn't matter even if Ed Tenney doesn't have joint access to locker 63 and Les Lippard has exclusive control because Ed Tenney had a privacy interest in the closed containers, including the blue cookie tin, which was in the big box, which was the second of the two boxes. I don't think he abandoned them because when he was arrested, he had keys to the locker. He had made copies of the keys to the locker. He was arrested on October 93. His possessions were packed in these boxes, which were closed. At least one of them was sealed, and it was being held for his benefit by Les, and that was the common understanding. Well, I mean, Les Lippard could have gotten rid of these. I mean, there had been no contact from Ed Tenney because of his other criminal problems probably in a long time. What prevented Les from just, you know, instead of moving them into 63, getting rid of them? He had control over them, and he could have done that had he chose to. The fact that he didn't speaks to his understanding of his agreement with Ed, that he was keeping the boxes for Ed. Les didn't do anything about the boxes until Donnie was arrested on May 2, and then Donnie made a confession to a number of her crimes. At that point, the police were looking for Ed because they had heard that Les had storage lockers. Les didn't do anything about removing boxes at that point, and he had stored them for Ed and for Don and for Michael and for Bobby, as was the agreement in the family. So he could have gotten rid of them, and whether that would have been a trespass to Ed's property or not, it would have been a violation of the agreement or not. The fact is he kept them, and they were private, and he testified in a suppression hearing that he did not have authority to actually go into those boxes or the cooking tin. He was just keeping them. The whole problem in the case is even if you believe that Les had exclusive control to make a general consent to the entry of Unit 63, the general consent does not carry over to the search of the cartons or the containers, especially the blue cooking tin. And it's just like the James case, which is the Illinois Supreme Court case that was cited to the circuit court judge and is cited in our briefs, the purse on the passenger side of the car where the driver made a general consent to the officer to search the car, but the officer relied on that general consent to open the purse, which our Supreme Court said was done improperly because it was done without inquiry as to whose purse it was. It was done without inquiry as to whether the driver had the authority to authorize the search of the purse. Well, the inquiry needs to be made when the situation is ambiguous. Isn't that correct, if we were to assume this common authority doctrine applies? Right. But as far as the police knew regarding the search here, the situation wasn't ambiguous, was it? I mean, Les had the – explain why you think it was ambiguous. I think it was ambiguous and required inquiry because Les told everybody, he started with the ASA and when he got the immunity agreement, and when he got to the locker, he signed the consent form, he said, these are the boys' things. Whoever packed them, they are packed carton by carton, individual by individual. The Ed box, the first one had Ed's name on the sides. It had some tape on it. It clearly had been taped before. So the police knew that these were private containers segregated by person as to possessions. And that's what Les told the ASA, Barsanti, and that's what Les told Cannon and Anderson. And the reason that Les was there was because they wanted Les to identify which stuff was Ed's and which stuff was Don's, because they were going to grab those. They weren't interested in Michael's stuff, obviously. So there was ambiguity because the police didn't understand the law. They thought they could act on their general consent. They were just like the Officer Phillips in the James case, and they assumed they could go into the cartons, even though they had been told they were private – they were packed individual by individual with just Ed's things and Ed's box. Whose name was on the storage locker? Well, Les rents the storage locker. Okay. Who paid for the storage locker? As far as Unit 63 is concerned, Les paid for the locker, and he had the keys to the padlock. And we don't argue – we agree, everyone agrees that Les had the authority to allow the police to enter the Unit 63. Rob comes in when you question whether or not – excuse me, I question whether or not they relinquished control of these boxes to Les when they gave them to him and he had a storage locker and he paid for the storage locker. You're saying they never relinquished control, like the purse. Right. Isn't that – can't we distinguish the purse from a storage locker and property that wasn't even looked at for how long by this particular defendant? Well, one problem would be Les' testimony at the suppression hearing was that he did not have the authority to go into anybody else's boxes. And the second problem would be that Les maintained control of the boxes and kept them for the others. So by his maintaining control over the boxes, his maintaining control, can't one argue that the others relinquished that control to Les? Well, one could argue that, but there's no evidence in the record to contradict Les' testimony that he did not have the authority to enter the boxes. Well, there's no evidence in the record that they had an agreement either. Don didn't testify to an agreement. Michael didn't testify to an agreement, did he? Because I know Michael somewhere testified. Well, Michael testified at trial at the suppression hearing. Les and Ed both testified that they packed – the boxes were packed individual by individual and put into the storage locker. And that was their longstanding practice. Well, a practice is different than an agreement. You can pack your own boxes, but if you give them to somebody and that person cares for them, where is the specific agreement in this record that says, Uncle Les, I'm giving you these boxes to take care of for me. Don't let anybody in them. I believe Ed's testimony supports that. And the trial court never made a finding to the contrary. And besides that, for both and other purposes, I don't think we have to show a contract violation. There's an understanding is good enough because – Well, Ed's testimony supports it, and I believe Les' testimony supports it. Well, Ed didn't have any place to put these things because Ed was either in prison or on the run. So where is he going to put them? Let me put it this way. When they were moving out of the home, the farmhouse – In North Aurora. In East Aurora. Oh, East Aurora. The group packed boxes, and Les testified that some of those boxes went into the storage unit right away. There is a common accepted idea in our culture that if you're moving your home and you're packing your things into your boxes, you have a high expectation of privacy in those cartons, in those boxes. And that is the expectation of privacy that Ed had. And he gave the possession of the bailment of the goods to Les, and Les honored that by keeping them the whole time. But by the same token, in a bailment, if they're not revisited, that person can dispose of them, can exercise control and authority over them. The question is expectation of privacy, and the legal contract of property law and contract law is not necessarily controlling. But here's the rub. The police are bound by the Fourth Amendment, even if Les is not. Les may have changed his mind, and he even testified to two contradictory positions. Well, he got limited immunity as opposed to general, so maybe he changed his mind. At the suppression hearing, he said, I rented the storage unit. I can do what I want with those boxes, which is true as a matter of fact, maybe true as a matter of law. But he's acting as a police agent, and the police are not able to do that. The police have to honor the Fourth Amendment and the expectation of privacy. And Ed's box was taped. The tape had come off of it. It was duct tape. So the police had reason to believe that the box had been taped and was intended to be private. It was marked as Ed, Ed's box, and Les was telling them whose boxes were who. It's pretty clear from the trial testimony that the big box and the cookie tin were kept right next to where Ed slept. Michael testified that those were Ed's things. Les knew those were Ed's things. Les was telling the officers, those are Ed's things. Les testified, I didn't have any authority reasoning then to go into those things. He testified at the hearing. What did he say the day they went into Locker 63? All he said that day, as I recall in his testimony, is he identified those are the things Ed's packed, or those are Ed's things, these are Donnie's things. He didn't say I don't have authority to go into those. He said that at the hearing, some several months later. Even if, let's take Basanti's testimony that Ed, Les said he packed all the boxes himself. Even if that's true, once he seals the boxes and marks them as Ed's, they were intended to be private. And he's respecting the expectation of privacy that he understands exists. What he was saying to the police was I don't want to be charged with possession of stolen property. I know there's proceeds of burglaries from all over the place. There's proceeds of burglaries from Warrenville. And there might even be some proceeds in the case you're investigating, which is the home invasion murder of Tina Johansson case. He didn't really know, but he said there might be. And the point at that point was he has an interest in getting immunity. He has an interest in breaching any agreement that he had with the others, at least with Ed and Don. He was going to say, please go in there and get that stuff. If you don't charge me, I'm going to give it to you so you won't charge me. But his interest is different from the police officer's responsibility to honor the Corp of Army. And what they didn't do was inquire. If we look at this again from the standpoint of the police and what they knew at the time and whether or not the situation was ambiguous, I mean, Matlock tells us that either consent can be obtained from someone who does have common authority. But there's also language in that case that says, or other sufficient relationship to the premises or effects to be inspected. From the police standpoint, they knew, did they not, that it was Ed who went in and paid the bill for the storage locker, had the keys, everything we talked about before. This other part of Matlock would have given the police what they needed to go in and take that without violating the Fourth Amendment. I certainly agree that the police were standing by when Les went in and paid the back rent, when Les pulled out the keys and opened the catalogs and opened the doors on both lockers. I certainly agree with that. And there's no question that Les had some kind of authority to generally consent to their entry into the storage unit. But the fact remains is Les told the ASA and the police that those cartons were Don's cartons and Ed's cartons. And they wanted to find just Don's cartons and just Ed's cartons. But they knew that the other cartons were not important to them. And so they knew those cartons, which were closed, were limited to just those two individuals. And I think that argues that even if Les had the exclusive control of the storage unit, he didn't have any greater power than a general consent power. He didn't have the power to authorize the police to go into those units. And the police knew those were the boys' things in their cartons. It was just like the purse in James. How are the items in the storage unit different than the gun? Les had the gun by virtue of being passed down. Was he just, you know, was that a bailment too? Because there's no serious concern about it. Donnie had the gun. That's the long nose Ruger .22. Correct. Donnie had the gun. Les went and got the gun because he was constantly trying to keep the guns out of the hands of the boys. He went and got the gun, and he kept it, and he moved to West Chicago. When Donnie was arrested on the 2nd, Les found out about the arrest, found out about the chargers, and that's when he went in to talk to the police on May 8th, and he said, I have a gun, you may be interested, at my home. That's Donnie to Les. It had nothing to do with the long nose Ruger at that point. It was in Donnie's possession. All right, Counsel, you have time for rebuttal. Thank you very much. Good morning, Your Honor. Stine Kim for the people. My first comment is going to address something Justice Zinoff mentioned about the Matlock and the relationship for the effects to be inspected. This is what Les has said, that the lockers were rented by him. He considered them under his jurisdiction. He was responsible for what was in the lockers, so it gave him the right to open the boxes. And that is at page 4082, and it's referenced in my brief at page 10. Well, and your opponent argues even if Les thought that he had authority, and Les thought that they were his boxes and that he was responsible, he's saying that's contradicted by the Fourth Amendment. How do you respond to that? I disagree with that. First of all, Zinoff pointed out that we're looking at the facts that the police knew at the time of the search. And at the time of the search, Mr. Varsanti said that Les said in late 1983 they moved Les' loaded boxes with items belonging to various sons and Ed and put them in storage. So that gives Les equal or greater control to any boxes because he has loaded them. There's no expectation of privacy if he has loaded things into the boxes. If he's loaded things into the boxes. Right. So he – That was what Varsanti said that Les told him, that Les has loaded the boxes. There's no expectation – Loaded the boxes into the storage unit. Loaded boxes with items. Sorry. Right. But he didn't load the items into the individual boxes. Les loaded boxes with items. And that's – the page references I have for that is 3883 and 3890. Well, I agree with that. But you initially said that he loaded the items into the boxes. So your opponent is arguing that boxes were – were they sealed or were they not sealed? There's controversy on that. The judge specifically made the finding in his ruling that if the boxes were ever sealed, they were not sealed at the time of the search. But they had his name on them. There is one box that had the name Ed on it in the storage unit. Detective Cannon and, I believe, Anderson both agreed there was only one box. But Ed's testimony is that he loaded, labeled, and sealed four or five boxes. So that's a big controversy. The blue cookie tin was actually located in or on a box where Les is pulling out some of the stuff and saying, this is my stuff. So that's co-mingled with Les's stuff. So if ever Ed loaded the boxes himself, sealed it, that was not the case, you know, at the time of the search. Because we only have one box with even his name on it where he said he had four or five that he had done. There seems to be a disagreement between defense counsel and you about when they get to the storage locker and he is now identifying this is Ed's stuff, this is Don's stuff. Is that an admission, I think, as Mr. Fossett would like us to accept, that that's their stuff, I don't have anything to do with it, or is that just for purposes of identification? That's just, I mean, if you take the statement that Mr. Rossanti made, that Les said that he loaded stuff into boxes, all he's doing is identifying, you know, among the boxes that he's loaded which property belongs to Michael, which belongs to Les, which belongs to Don, which belongs to Ed. So the fact that he's saying, oh, that's, you know, Don's bike or that's, you know, somebody's fur or golf clubs doesn't mean that there's any expectation of privacy or that the police had to get any special permission because Les has access to all of that. So you still have common authority over all of that property is your position? Yes. He, as you pointed out, he has been the one that has paid the rent on the unit the entire time. The defendant was in jail when the specific two units were rented, so he could have never had access to those two units. Les said that, you know, it was his lock that was on it, it was his key, he had access to the keys. Some of the other statements is that Detective Anderson, I referenced this in my brief at page 8, Les believed the items he put in storage could be the property of burglaries or homicide victims, and Les said that he put the stuff in the storage. So, again, at the time of the search, the officers believe that Les has total access to that, equal control. Again, Les's statement, it's my unit, I'm responsible for everything in there, I have permission to grant access to the box. That is what the police knew at the time. The judge, again, made the specific finding that the ad box was, if ever sealed, not sealed at the time of the search. Les's comment is that he believed that he had pulled out the ad box and that it was not sealed and he could see inside. With the testimony that opposing counsel highlighted, weren't the police at least faced with an ambiguous situation which would have required them to ask more questions? I don't believe so. With going item by item, the blue tin is not labeled with Ed's name or anything. It is only after that blue tin, which was pulled out of the box with Les's things in it, is opened and they're looking at the stuff that Les says, oh, that's Ed's tin. So the police were not under any notice to ask any more questions. The blue tin came out with some of Les's things and it's only afterwards it's identified as his specific property. So let me get your position straight. You're saying that the way you're distinguishing what your opponent is trying to say about the property and whether or not Mr. Lippert misunderstood his position, you're saying what was in the mind of the officer at the time is what controls. That is what the case law says, is that we're looking at what the police know as to their obligation. If it's an ambiguous situation, to ask more questions. So, again, we're looking at what they know, and particularly with the blue tin, they don't have any clue to ask more questions. With the Ed box, again, they don't have the clue to ask, if they find it ambiguous, to ask more questions because Les said that he believed that he took that box out. It's only, and I believe on the videotape, which is People's Exhibit 53 at I think 106 or somewhere in that, that someone is asking, you know, I don't know whose box this is, and that's in reference to what is later seen on the video to be the Ed box. So, obviously, at the time of the search, the officers don't know whose box it is. Les has moved it. He said the flaps, you know, he could see in. If there was ever any expectation of privacy, he obviously didn't believe that there was that expectation of privacy, and he would have conveyed that to the officers. Do you believe he could have relinquished that expectation of privacy by abandoning those boxes? Oh, yes. Well, first of all, there's controversy on who exactly loaded the boxes. He certainly abandoned them by never doing anything. You know, the box, I believe, went, as you noticed, they lived first in St. Charles and then in Austin and then a brief stay at the Geneva Motel, the house in Warrenville, and then finally Les moves to Joliet. And Ed moves with a girlfriend. Yes. I believe that's in, like, the Geneva Motel, Warrenville time period. Was there any evidence or any testimony that when he moved in with a girlfriend that he had ever gone back to that storage space? No. I believe he testifies between, like, 93 and 95 he was never at the storage area. There's also no evidence of this alleged agreement for the storage area. Les had the storage area. He allowed his sons and Ed to keep various boxes of stuff there. Well, didn't Ed contribute to the rent, at least initially while he was out of prison, the rent of their premises, wherever they were living at the time, and that part of that money then would have helped defray the cost of one of the storage facilities? That's a disagreement or a discrepancy in Ed's and Les's testimony. Les says he rented the storage units. Ed's testimony, and then he paid the rent on those. And certainly, you know, after when the defendant is in prison and after he moves out with them, he's not contributing in any way to any storage fees for it. But Les's testimony is that, and there is testimony that they pooled some money for household expenses, but Les said, you know, that there's never any agreement that part of that goes to the storage. Les considers the storage to be his. Is there? All right. If Your Honors have no more questions on the storage. Well, I have a question. Okay. The police had no reason not to get a warrant, did they? They had no reason either. I mean, yes and no. What they've done is they have the statements by Don implicating both himself and in the murders. They have statement from, I believe, a cousin, Joey, that Les has some storage units that there may be stuff in. So they become interested in the storage units. Then they talk to Les, and Les says, yes, I have storage units. I want an immunity agreement for either obstruction of justice or property offenses because from Don, he believes that some of the stuff in his storage unit is proceeds from the burglary and possibly from the homicide victims. So Les believes that he could face criminal charges for what he's allowed to be put into his storage unit. So, you know, that alone indicates that Les believes he's totally responsible for that unit. And certainly he conveyed that to police by getting that agreement. So, no, I don't think the police, you know, are under any sort of red flags that they need to go and get a search warrant. How do you distinguish this case from the purse, the boxes in this case from a purse in a car? Well, again, Les has told the police that this is his unit, that he's responsible for what's in it, and he certainly believes that he has the ability to consent to anything. There's also the various statements that he packed the boxes that went into and he's transported. So he does, in fact, have access control of all of those boxes. You know, if the defendant has, you know, access and control, Les does also at least to the same extent. So, you know, at the least he has equal access. I understand that the gun actually came from Donnie, the .22 Ruger, but there was some testimony that another gun jammed and Donnie may have given it to Ed. And so why isn't the gun an issue similar to this? Okay. Ed was arrested with one of the guns in 93. The other gun, according to Donnie's testimony, is when he heard that Ed was arrested, he knew that the other gun was at Carmela's house or the girlfriend's house. So Donnie went to get that other gun and take it out because he knew that she had young children. So Donnie took the other gun, which was at Ed's house but not apparently discovered, and he had it with him. He moved in with his mother. The mother discovered the gun, took it to Les and gave it to Les, and then Les has the gun apparently at his house. So in that sense, the gun, even though it may have some relationship to Ed, is really considered Donnie's gun and this is not Donnie's case? Well, no, because Donnie's testimony is also that Ed gave him money for the guns and that Ed had possession of the guns. So ownership, according to Donnie, those were in fact Ed's guns and he sometimes has possession of them. There's various talks that at times the guns ended up in the storage unit and Don and Ed went and got them out of the storage unit.